

# THE ATTORNEY GENERAL
## OF TEXAS

**PRICE DANIEL**
ATTORNEY GENERAL

AUSTIN 11, TEXAS

December 4, 1951

Hon. C. H. Cavness
State Auditor
Austin, Texas

Dear Sir:

Opinion No. V-1365

Re: Several questions pertaining
to the use of soil conserva-
tion district funds.

You have submitted for our consideration several questions pertaining to the expenditure of funds by soil conservation districts. The first question is the following:

"1. Of the following types of revenue normally received by soil conservation districts from their operations, which, if any, should be deposited to State appropriated funds . . .?:

"A. Rental from equipment purchased from State appropriated funds.

"B. Sale of seed, fertilizer or chemicals purchased from State appropriated funds.

"C. Refunds on other expenditures made from State appropriated funds.

"D. Sale of obsolete equipment purchased from State appropriated funds."

House Bill 97, Acts 51st Leg., R.S. 1949, ch. 540, p. 1000 (Art. 165a-8, V.C.S.), appropriated to the several soil conservation districts of Texas two and a half million dollars for each of the fiscal years of 1950 and 1951. Section 5 of House Bill 97 provided that "any funds granted hereunder to any soil conservation districts which shall remain unexpended at the end of the biennium shall revert to the General Fund." In Opinion V-999 (1950) we advised you that the use of granted funds to purchase seed to be resold would not constitute an expenditure of the funds so as to prevent the moneys received upon the resale from being a part of the granted funds.

The fact that fertilizer or chemicals were the subject matter of the sale would, of course, make no difference in this conclusion. By analogy, we think moneys received from refunds on expenditures made from State appropriated funds have not been

"expended" and remain a part of the granted funds. So, too, moneys obtained from the sale of obsolete equipment purchased with State appropriated funds have not been "expended" in the sense that would prevent their classification as State appropriated funds. You are therefore advised that revenue received by a soil conservation district from the sale of seed, fertilizer, or chemicals purchased from State appropriated funds, refunds on other expenditures made from State appropriated funds, and the revenue received from the sale of obsolete equipment purchased from State appropriated funds should be deposited to "State appropriated funds."

In our Opinion V-999, supra, in stating that the use of State appropriated funds to purchase seed to be resold would not constitute an expenditure of the funds so as to prevent the moneys received upon the resale from being a part of the granted funds, we assumed that the districts did not resell the seed at a profit. It is our opinion that the amount realized upon the resale over and above the amount expended for the seed would be in the nature of earnings of the district and would not constitute a part of "State appropriated funds" and should be deposited by the district in its local fund account.

It is our opinion that rentals received by a soil conservation district from equipment purchased from State appropriated funds would be in the nature of earnings of the soil conservation district and would not constitute State appropriated funds and should be deposited by the district in its local fund account.

Your second question is the following:

"2. Most districts which we have examined to date have local funds which have been accumulated principally through donations, the purchase and sale of seed and/or fertilizer at a profit, and the rental of equipment purchased by the district or granted or loaned to the district. Are the expenditures from these local funds subject to the statutory regulations imposed upon the expenditures from State appropriated funds provided in House Bill 97, 51st Legislature, Regular Session as amended by House Bill 190, 52nd Legislature, Regular Session?"

To the extent that soil conservation districts may exercise only such powers as have been conferred upon them by law and must operate pursuant to the statutes creating them and regulating their operation, all funds of such districts must be expended consistently with the provisions of House Bill 97, supra, and House Bill 190, Acts 52nd Leg., R.S. 1951, ch. 497, p. 1206 (Art. 165a-9,

V.C.S.). Thus, Section 3 of House Bill 190, re-enacting Section 6 of House Bill 97, providing for and regulating the deposit and withdrawal of all grants of assistance and funds received by a district, applies equally to State appropriated funds and to funds received from other sources. Likewise, the restrictions on purchasing or repairing machinery (Sec. 2a, H.B. 97; Sec. 2, H.B. 190), the provisions regulating surety bonds (Sec. 4, H.B. 97; Sec. 4, H.B. 190), audits (Sec. 4, H.B. 190), sale of equipment, seed, and fertilizer (Secs. 7, 8, H.B. 190) are protective provisions which would apply regardless of the original source of the funds involved. Your second question is therefore answered in the affirmative.

Your next question reads as follows:

"3. Can the following types of expenditures be legally made from either State appropriated funds or local funds or both:

"A. Awards for essay contests on various soil conservation subjects.

"B. Contributions to the Texas Association of Soil Conservation District Supervisors.

"C. Awards for various soil conservation projects.

"D. Purchased entertainment for the promotion of soil conservation. One District sponsored a 'Bankers Relation Banquet,' and invited all of the bankers and heads of other loan agencies in the District. The purpose of the banquet was to acquaint the bankers and other guests with the soil conservation program and needs of the District. The costs of the banquet were paid from the State appropriated funds."

The very broad purposes and over-all policies of our State soil conservation laws are set forth in Section 2 of Article 165a-4, V.C.S. It is difficult to conceive of a greater, and at the same time valid, grant of powers or of one more general in terms than that bestowed upon the State Soil Conservation Board by Section 4 of Article 165a-4, V.C.S., and upon the supervisors of soil conservation districts by Section 7, Article 165a-4, substantially re-enacted in Section 4E, Article 165a-8, V.C.S. (H.B. 97), and Section 13 of House Bill 190. Nevertheless, we do not believe that the Legislature intended to authorize the expenditure of either State appropriated or local funds for the giving of awards for essay contests on various soil conservation subjects, or for the giving of awards for various soil conservation projects, or for the

purchase of entertainment for the promotion of soil conservation.
A presumption will be indulged that the Legislature desired and
intended to enact a valid law, Pickle v. Finley, 91 Tex. 484, 44 S.W.
480 (1898); Maud v. Terrell, 109 Tex. 97, 200 S.W. 375 (1918); 9
Tex. Jur. 481, Constitutional Law, Sec. 61. Since a statutory au-
thorization for expenditures for the purposes enumerated in sub-
divisions A, C and D of your third question would be unconstitu-
tional, as we will hereinafter show, we are of the opinion that such
expenditures were not contemplated or authorized by the Legisla-
ture. Section 52 of Article III of the Constitution of Texas provides:

> "The Legislature shall have no power to author-
> ize any county, city, town or other political corpora-
> tion or subdivision of the State to lend its credit or to
> grant public money or thing of value in aid of, or to
> any individual, association, or corporation whatsoever,
> . . . "

This provision is broad enough to embrace not only State appro-
priated funds but funds or things of value donated to the political
subdivision by others.

If, as we have been advised occurred in one instance,
the Chamber of Commerce of a certain city saw fit to donate funds
for the purpose of providing entertainment designed to promote
soil conservation, the organization could accomplish this result
only by paying for the entertainment itself because once the funds
are donated to the political subdivision of the State, they become
public money and the property of the political subdivision.

In subdivision B of your third question you request our
opinion as to whether expenditures may be made by a soil conser-
vation district from either State appropriated funds or local funds
or both as "contributions to the Texas Association of Soil Conser-
vation District Supervisors." We were unable to determine the
nature of the organization referred to as the "Texas Association
of Soil Conservation District Supervisors" in that nowhere in our
soil conservation law could we find that such an association was
provided for. However, you have advised us orally that the district
supervisors of all the soil conservation districts in Texas have
organized themselves into an association for the purpose of carry-
ing out the over-all purposes of the soil conservation program. We
believe that the supervisors had the authority to associate them-
selves together by virtue of Section 11 of Article 165a-4, which
reads as follows:

> "The supervisors of any two (2) or more districts
> organized under the provisions of this Act may cooper-
> ate with one another in the exercise of any or all powers
> conferred in this Act."

The legislative determinations and declarations of policy contained in Section 2 of Article 165a-4, V.C.S., the State Soil Conservation Law, set forth in general terms the broad purposes and over-all policies of our State soil conservation laws. [1]

Soil conservation districts created under the authorization of Section 5 of Article 165a-4 are governmental subdivisions of the State, public bodies corporate and politic. See Secs. 5F, 7, Art. 165a-4, and Opinion V-999.

The supervisors of such districts, under Section 6 of Article 165a-4, have express rights, powers, and duties conferred upon them. We quote the following excerpt from Section 6:

---

[1] "Sec. 2. (c) The Appropriate Corrective Methods. That to conserve soil resources and control and prevent soil erosion, it is necessary that land-use practices contributing to soil wastage and soil erosion may be discouraged and discontinued, and appropriate soil-conserving land-use practices be adopted and carried out; that among the procedures necessary for widespread adoption, are the carrying on of engineering operations such as the construction of terraces, terrace outlets, check dams, dikes, ponds, ditches, and the like; the utilization of strip cropping, lister furrowing, contour cultivating, and contour furrowing; land irrigation, seeding and planting of waste, sloping, abandoned, or eroded lands to water-conserving and erosion-preventing plants, trees, and grasses; forestation and reforestation; rotation of crops, soil stabilization with trees, grasses, legumes, and other thick-growing, soil-holding crops, retardation of runoff by increasing absorption of rainfall; and retirement from cultivation of steep, highly erosive areas and areas now badly gullied or otherwise eroded.

"(d) Declaration of Policy. It is hereby declared to be the policy of the Legislature to provide for the conservation of soil and soil resources of this State, and for the control and prevention of soil erosion, and thereby to preserve natural resources, control floods, prevent impairment of dams and reservoirs, assist in maintaining the navigability of rivers and harbors, preserve wildlife, protect the tax base, protect public lands, and protect and promote the health, safety, and general welfare of the people of this State, and thus to carry out the mandate expressed in Article XVI, Section 59a, of the Constitution of Texas. It is further declared as a matter of Legislative intent and determination of policy that the agencies created, powers conferred and the activities contemplated in this Act for the conservation of soil and water resources and for the reduction of public damage resulting from failure to conserve such natural resources, shall be supplementary and complementary to the work of various river and other authorities now established in the State and to other State officers, agencies, and districts engaged in closely related projects, and shall not be duplicative thereof nor conflicting therewith."

"The supervisors may employ such officers, agents, and employees, permanent and temporary, as they may require, and shall determine their qualifications, duties, and compensation. The supervisors may delegate to their chairman, to one or more supervisors, or to one or more agents or employees, such powers and duties as they may deem proper. The supervisors shall furnish to the State Soil Conservation Board, upon request, copies of such ordinances, rules, regulations, orders, contracts, forms, and other documents as they shall adopt or employ, and such other information concerning their activities as it may require in the performance of its duties under this Act."

Section 7 of Article 165a-4 likewise confers powers upon districts and supervisors, the pertinent powers being summarized below:

"(1) To carry out preventive and control measures within the district including, but not limited to, engineering operations, methods of cultivation, . . . and the measures listed in Subsection o, of Section 2 of this Act, on lands owned or controlled by this State or any of its agencies, with the cooperation of the agency . . . having jurisdiction thereof, and on any other lands within the district upon obtaining the consent of the occupiers . . .

"(2) To cooperate . . . with, and, within the limits of appropriations duly made available to it by law, to furnish financial or other aid to, any agency . . . or any occupier of lands within the district, in the carrying on of erosion control and prevention operations within the district, . . .

"(3) To obtain options upon and to acquire, by purchase, exchange, lease, gift, grant, bequest, devise, or otherwise, any property, real or personal, or rights or interests therein; to maintain, administer, and improve any properties acquired, to receive income from such properties, and to expend such income in carrying out the purposes and provisions of this Act; and to sell, lease, or otherwise dispose of any of its property or interests therein in furtherance of the purposes and the provisions of this Act; . . .

"(6) To develop comprehensive plans for the conservation of soil resources and for the control and prevention of soil erosion within the district, which plans

shall specify in such detail as may be possible, the acts, procedures, performances, and avoidances which are necessary or desirable for the effectuation of such plans, including the specification of engineering operations, methods of cultivation, the growing of vegatation, cropping programs, tillage practices, and changes in use of land; and to publish such plans and information and bring them to the attention of occupiers of lands within the district; . . ."

The Texas Association of Soil Conservation District Supervisors elected a president and five vice-presidents. The Association authorized and directed the president and five vice-presidents to form a corporation under the name of "Soil and Water Conservation, Inc." In August, 1951, the corporation was granted a charter under Subdivision 2 of Article 1302 of the Texas Revised Civil Statutes of 1925. The purpose clause as incorporated in its charter provides:

"(1) To promote to the utmost the conservation of soil and water resources for the security of our country and its people.

"(2) To bring about exchange of information that will secure a constructive conservation program.

"(3) To disseminate scientific data and factual information concerning soil erosion control and flood prevention.

"(4) To encourage uniformity of basic policies and objectives in soil and water conservation work.

"(5) To foster and develop active farmer participation and leadership in conservation and in the affairs of soil conservation districts.

"(6) To encourage the closest co-operation possible between soil conservation districts and a coordinated effort on their part.

"(7) To publish a periodical and any other publications which would further the purposes of this corporation.

"(8) To make gifts of money or of real or personal property or of other things of value to non-profit charitable, benevolent, literary, religious, agricultural or educational organizations in the furtherance of the purposes of this corporation."

The charter further provides that the president and five vice-presidents of the Texas Association of Soil Conservation District Supervisors elected for each year shall comprise the board of directors of the corporation. We were furnished with a copy of the by-laws of Soil and Water Conservation, Inc., and find nothing contained therein that is inconsistent with our soil conservation laws. We are of the opinion that the means or instrumentalities to be used by the soil conservation districts in effectuating the powers and duties conferred on such districts were left to the sound discretion of the districts, and that the means employed as outlined above in cooperating with one another in the exercise of the powers conferred in the soil conservation laws is a legitimate exercise of the discretion reposed in the soil conservation districts.

The State Soil Conservation Board informed us that the main purpose of the cooperative program is to publish jointly a monthly magazine, in order to publish plans and information as to water and soil conservation and to bring them to the attention of the various soil conservation districts and to the occupiers of land within the various soil conservation districts. The corporation, as agent for the various districts, will publish and circulate the magazine. It is our opinion that the soil conservation districts may use either State appropriated funds or local funds in making "contributions" or payments to the Texas Association of Soil Conservation District Supervisors to be used by it or its agent, Soil and Water Conservation, Inc., in carrying out the "comprehensive plans for . . . conservation of soil resources" and in disseminating "information throughout the State concerning the activities and programs of . . . Soil Conservation Districts" (Art. 165a-4, Sec. 4G(4) and in bringing them to the attention of the various districts and "occupiers of lands within the districts; . . ."

Your next question reads as follows:

"4. Do such funds represented by inventories of, or accounts receivable resulting from the sale of, seeds, fertilizers and chemicals bought to be resold but on hand on August 31st, 1951, that were originally paid for out of proceeds of the State Appropriation provided in House Bill 97 of the 51st Legislature constitute a part of the unexpended State Appropriation that is reappropriated by the provisions of House Bill 190 of the 52nd Legislature? (Since your answer to Question 4 in your Opinion No. V-999 (p. 20 thereof) holds such stocks are a part of unexpended State funds, the proceeds will now go to General Revenue unless reappropriated by House Bill 190.)"

Opinion V-999 does hold, in effect, that stocks of seed purchased to be resold constitute a part of any unexpended State appropriated funds. The opinion further points out that "if at the end of the biennium a soil conservation district has purchased seed on hand that is later resold, the amount received from the resale should then be paid into the General Fund of the State Treasury." However, since House Bill 190 appropriates the unexpended balances of all the sums appropriated and granted to the several soil conservation districts for the fiscal year ending August 31, 1950, and for the fiscal year ending August 31, 1951, it follows that the amount received from the resale of seed after the biennium would not be paid to the General Fund but should be retained by the individual soil conservation districts. Proceeds from resale of fertilizers and chemicals received after the close of the fiscal year ending August 31, 1951, should likewise be retained by the individual districts. Also, it makes no difference whether the proceeds were received by reason of an account receivable resulting from sale of the seeds, fertilizer, or chemicals prior to the end of the fiscal year or whether the sale itself took place after the end of the fiscal year.

The answer to your fourth question makes unnecessary an answer to your fifth question.

Question No. 6 reads as follows:

"6. In our audits we have found where one District purchased 1 New Headberg 'Uni-Grader' with 9' Conveyor Elevator, Serial No. 548, Model 12, Ford Engine #1172-A16AT D 162 S Super V Belt - $2,695.00. Other Districts have entered into rental purchase agreements which have resulted in equipment being bought for amounts in excess of $1,000.00. One District entered into a rental purchase agreement and paid the initial monthly installments from the District's locally earned funds. However, four monthly installments at $350.00 each, totalling $1,400.00, were paid from the State Appropriated funds during the purchase agreement period. In neither of these instances did the Districts place their orders through the Board of Control.

"Sec. 2a of House Bill No. 97 of the 51st Legislature reads as follows:

" 'Any item of machinery or equipment, the purchase price of which exceeds One Thousand Dollars ($1,000), shall be purchased through the Board of Control under such regulations and terms as is required

by State Law governing purchases for the State or any
of its political subdivisions which make purchases
through the Board of Control.'

"Do these acts on the part of the Board of Dis-
trict Supervisors of the Soil Conservation Districts
constitute illegal expenditure of State Appropriated
funds, and if so to whom and to what extent are they
liable?"

The provisions of Section 2a above quoted are clearly
mandatory. Both the State appropriated funds and the local funds
used for these purposes were illegally expended. The Board of
District Supervisors of the Soil Conservation Districts are offi-
cers of the districts (so referred to in Article 165a-4, Sec. 5,
par. F) and the length of their employment is described as their
"term of office" (165a-4, Sec. 6). We quote the following summa-
tion of the rules governing the responsibility of officers for pub-
lic funds from 34 Tex. Jur. 473-474, Public Officers, Sec. 86:

"Officers are personally responsible for any
unauthorized or improper disbursement or misappli-
cation of public funds. This liability extends to mem-
bers of a board who participate in the misappropria-
tion or diversion and to a married woman who is a
member of such a board. But of course an officer not
shown to have participated in the diversion or misap-
propriation is not responsible therefor."

Under this rule district supervisors who were respon-
sible for the illegal expenditure of the State and local funds are
liable to their respective districts to the extent of damage, if any,
suffered by the particular district.

## SUMMARY

Revenues of a soil conservation district derived
from the sale of seed, fertilizer, or chemicals origi-
nally purchased with State appropriated funds for re-
sale, with the exception of profits realized therefrom;
money received from refunds on expenditures made
from State appropriated funds; and revenue received
from the sale of obsolete equipment purchased with
State appropriated funds should be deposited to "State
appropriated funds."

Rentals received by a soil conservation district
for the use of equipment are in the nature of earnings

of the soil conservation district and should be deposited by the district in its local fund account.

Expenditures from local funds are subject to the statutory regulations imposed upon expenditures from State appropriated funds by Arts. 165a-8 and 165a-9, V.C.S. The following types of expenditures cannot be made from either State appropriated funds or local funds: (1) awards for essay contests on various soil conservation subjects; (2) awards for various soil conservation projects; (3) costs of a banquet at which bankers and heads of other loan agencies were guests of the district for the purpose of acquainting them with the district soil conservation program. Soil conservation districts may use either State appropriated funds or local funds in making contributions to the Texas Association of Soil Conservation District Supervisors to be used by it or its agent, Soil and Water Conservation, Inc., in carrying out the objects and purposes of the soil conservation laws.

State appropriated funds represented by accounts receivable and by inventories of seeds, fertilizers, and chemicals bought to be resold but on hand on August 31, 1951, are covered by the appropriation made by Art. 165a-9.

Section 2a of Art. 165a-8 requires that any item of machinery or equipment which costs more than $1,000 must be purchased through the Board of Control. This provision is mandatory, and State appropriated funds and local funds used to pay in whole or in part for machinery or equipment costing in excess of $1,000 and not purchased through the Board of Control were illegally expended.

Yours very truly,

PRICE DANIEL
Attorney General

W. V. Geppert

APPROVED:

Everett Hutchinson
Executive Assistant

Charles D. Mathews
First Assistant

Mrs. Marietta McGregor Creel
Assistants

WVG/MMC/mwb